UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:03CR198(RNC) |
| V. | : | |
| FERMIN AQUINO, a/k/a "Carlos" | : | April 25, 2005 |

**DEFENDANT'S SENTENCING MEMORANDUM**

On November 12, 2004, the defendant entered a guilty plea to Count One of the Indictment which charges Conspiracy to Possess with Intent to Distribute One Kilogram or More of Heroin., in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(i). Sentencing has been scheduled for April 26, 2005 and this Memorandum is submitted to assist the Court in the determination of an appropriate sentence for Mr. Aquino.

**Federal Sentencing Law After Booker/Fanfan**

On January 12, 2005, the Supreme Court handed down its decision in the consolidated cases of *United States v. Booker* and *United States v. Fanfan*, ___ U.S. ___, 125 S. Ct. 738 (2005). The Court's decision consisted of two separate majority opinions. In the first opinion, the Court ruled that sentencing procedures under the U.S. Sentencing Guidelines violate the Sixth Amendment right to a jury

trial because those procedures relied upon sentencing enhancements based on judge-found facts. In the second opinion, the Court held that the proper remedy, in light of the Court's Sixth Amendment holding, is for the Court to judicially excise the language from the Sentencing Reform Act of 1984 (SRA) that makes the Sentencing Guidelines mandatory. The Guidelines have thus become "effectively advisory" in all cases, including those in which there are no Sixth Amendment offending enhancements.

Since the *Booker/Fanfan* decision, the sentencing mandate found in 18 U.S.C. § 3553 has taken on new meaning. Although the sentencing Court is still required to "consider" the Guidelines, the Guidelines are no longer mandatory. The sentencing range computed under the Guidelines is now merely one factor among several Section 3553 factors that the Court must consider in determining the appropriate sentence in a particular case. The basic mandate of Section 3553(a) and the starting point of any sentencing analysis is the requirement that the district courts impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in Section 3553(a)(2): retribution, deterrence, incapacitation and rehabilitation. The "sufficient, but not greater than necessary" language found in the introduction to Section 3553 establishes a conceptual limit within which the subsequently enumerated sentencing factors should be considered.

The Court, in determining the particular sentence to be imposed, shall consider –

(1) "the nature and circumstances of the offense and the history and characteristics of the defendant;"
(2) "the need for the sentence imposed" (retribution, deterrence, incapacitation and rehabilitation);
(3) "the kinds of sentences available;"
(4) the sentencing range computed under the Guidelines;
(5) any pertinent policy statements contained in the Guidelines;
(6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and
(7) "the need to provide restitution to any victims of the offense."

18 U.S.C. §3553(a).

In the wake of *Booker/Fanfan*, the Second Circuit Court of Appeals has declined to specify what degree of consideration the District Courts must give to the Sentencing Guidelines.

> We need not on this appeal endeavor to determine what degree of consideration is required, or, to put it another way, what weight the sentencing judge should normally give to the applicable Guidelines range. We think it more consonant with the day-to-day role of district judges in imposing sentences and the episodic role of appellate judges in reviewing sentences, especially under the now applicable standard of "reasonableness," to permit the concept of "consideration" in the context of the applicable Guidelines range to evolve as district judges faithfully perform their statutory duties. Therefore, we will not prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to "consider" the Guideline. In other words, we will no more require "robotic incantations" by district judges than we did when the Guidelines were mandatory.

*United States v. Crosby*, 397 F.3d 103, 113 (2nd Cir. 2005). The Second Circuit has indicated, however, that in most instances the sentencing judge should still determine the applicable Guidelines range and perform the customary Guidelines analysis, including the analysis of any "departure" issues arising under the Guidelines. Beyond that, however, the Second Circuit has also recognized that there will now be instances in which a district judge, after considering all of the Section 3553 factors, will decide to impose a sentence which is neither within the Guidelines range nor imposed pursuant to traditional Guidelines departure rules. The Second Circuit has labeled this type of sentence, which was not recognized before *Booker/Fanfan*, a "non-Guidelines sentence." 397 F.3d at 111-112. Although the Sentencing Guidelines may not now be overlooked at the whim of a sentencing judge, the new scheme brought about by *Booker/Fanfan* certainly does allow for "somewhat more individualized justice." 397 F.3d at 113-114.

### The Court Should Impose A Non-Guidelines Sentence

The defendant has no serious quarrel with the Pre-Sentence report and the resulting Guidelines sentence computation of 70-87 months. Taking into consideration, however, "the nature and circumstances of the offense and the history and characteristics of the defendant," a sentence of less than 70 months is appropriate and could be imposed while still giving due consideration to the Guidelines and the other factors enumerated in 18 U.S.C. § 3553(a).

- 5 -

Fermin Aquino was born and grew up in a poor, rural area of the Dominican Republic. His family were farmers and there was little other work available to him at home. Beginning in the 1990's, Mr. Aquino began traveling to Puerto Rico and to the United States seeking better employment opportunities. He entered San Juan, Puerto Rico as a legal alien on September 29, 1993. He has a green card and is a permanent resident. He does not have any violations problems of any king in his Immigration file. Pre-Sentence Report ("PSR") ¶ 32. Mr. Aquino reported that he traveled back and forth between the United States and the Dominican Republic and the U.S. Customs file confirms this with departure dates of 1997 and 2001. PSR ¶ 32.

In addition to working in Puerto Rico, Mr. Aquino lived and worked for a time in Alaska. Because of the passage of time and a lack of specific employer information, we have not been able to verify all of Mr. Aquino's employment. PSR ¶ 40. A relative of Mr. Aquino has, however, supplied defense counsel with two pay stubs which corroborate Mr. Aquino's claims of employment. Copies of these pay stubs are attached as Exhibit "A." One pay stub documents Mr. Aquino's employment by Trataros, S.E., a construction company in Puerto Rico, for the pay period ending June 6, 1999. The other pay stub documents Mr. Aquino's employment by La Mexicana, Inc., a restaurant in Anchorage, Alaska, for the pay period ending September 19, 1999. Mr. Aquino reports that he worked for two restaurants in Anchorage and that he lived in Alaska for nearly

two years. This would coincide with the 2001 departure date indicated by the Customs/Immigration records. Since his arrest, Mr. Aquino has been detained at Wyatt Detention Facility and has been working in the kitchen there.

Although he is a documented alien who has lived in this country and in Puerto Rico off and on for more than a decade, Mr. Aquino has no prior criminal record. He reports that although he had a personal drug problem and used drugs himself, he never sold drugs until he came to New Haven in 2003. Although the lack of a prior criminal record does not excuse Mr. Aquino's culpable conduct in the instant case, the fact that this is his first offense at the age of 33 certainly says something very positive about the defendant's "history and characteristics."

Mr. Aquino has a common law wife and children in the Dominican Republic. When asked to describe himself, he explained that he has his "deficits and problems, but his children and his family make him special." In a candid self evaluation, Mr. Aquino also stated that he feels like "a failure" as a result of his conduct and legal problems. PSR ¶ 38. Since being at Wyatt, in addition to maintaining employment, Mr. Aquino has participated in a substance abuse treatment program and an anger management program. PSR ¶¶ 37 and 38.

Mr. Aquino has been debriefed on several occasions by Government attorneys and agents. He has never denied his involvement in the conspiracy and has entered into a stipulation of offense conduct with the Government. Mr.

Aquino was an associate of codefendant Carlos Lebron. Mr. Lebron is also from the Domincan Republic and Mr. Aquino had met him on a previous visit to the United States. The defendant bought heroin from Mr. Lebron and sold small quantities of heroin in order to sustain himself financially and to support his own drug use. He also helped package heroin and delivered heroin for Mr. Lebron. When Mr. Lebron left the country for approximately three weeks, Mr. Lebron left his cell phone with Mr. Aquino so that Mr. Aquino could serve Mr. Lebron's customers. PSR ¶¶ 8, 11 and 14.

Mr. Aquino does not intend to repudiate the drug quantity stipulation which he entered into with the Government. He has stipulated that the Guidelines equivalent of at least 1 kilogram but less than 3 kilograms of heroin was reasonably foreseeable to the defendant as a result of his participation in the conspiracy charged in the indictment and that is the quantity commensurate with his criminal activity and the relevant conduct associated with it. Mr. Aquino's role in the offense, for lack of a better description, was that of the right hand man for Carlos Lebron. But it is also true that the defendant's participation in this conspiracy was very short lived. Mr. Aquino's passport (Exhibit "B") indicates that he entered the country at New York City on June 13, 2003. He was arrested, with Mr. Lebron, on July 23, 2003. Thus, the defendant's participation was limited to a period of less than six weeks.

Mr. Aquino made a terrible mistake by agreeing to work with Mr. Lebron in the New Haven heroin operation. The Guidelines sentence of 70-87 months would be unnecessarily harsh, however, in light of Mr. Aquino's lack of any prior criminal record, his history of gainful employment and the short amount of time he was involved in this criminal enterprise. Apart from his personal drug use, Mr. Aquino lived a law abiding life for 32 years and attempted to better himself by seeking employment outside of his native country. In the assessment of the probation officer, Mr. Aquino is a "caring, thoughtful and devoted person who needs to redirect his life…With the proper focus, Mr. Aquino may be able to take care of his family and again become a productive member of society." PSR ¶ 58.

Under these circumstances, a multi-year jail sentence, but something less than 70 months, would be "sufficient, but not greater than necessary" to satisfy all the purposes of sentencing set forth in Section 3553(a).

THE DEFENDANT
FERMIN AQUINO

By_____
Dan E. LaBelle    of
HALLORAN & SAGE LLP
Fed. Bar #ct 01984
315 Post Road West
Westport, CT 06880
(203) 227-2855

## CERTIFICATION

This is to certify that on this 25th day of April 2005, a copy of the foregoing Sentencing Memorandum was mailed, first class postage pre-paid, and sent via facsimile to the following counsel of record:

H. Gordon Hall, Esq.
United States Attorney's Office
157 Church Street, 23rd Floor
New Haven, CT 06510
FAX # (203) 773-5376

Dan E. LaBelle

680130_1 DOC

- 9 -

# EXHIBIT A



| CO. | FILE | DEPT. | CLOCK | NUMBER |
|---|---|---|---|---|
| QVS | 000366 | 000033 | 0000002803 | 1 |

# Earnings Statement

TRATAROS, S.E.
813 29TH STREET
CAPARA TERRACE
PUERTO9 RICO 00920

Period Ending: 06/06/1999
Pay Date: 06/08/1999

Social Security Number: 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
Taxable Marital Status: Married
Exemptions/Allowances:
    Federal   Tax Exempt
    State:

PAULINO FERMIN AQUINO
CALLE ELNA APT#2
VILLA PALMAERA
SAN JUAN, PR 00901

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 7.0000 | 40.00 | 280.00 | |
| Gross Pay | | | $280.00 | 1,855.00 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Social Security Tax | -17.36 | 115.01 |
| | Medicare Tax | -4.06 | 26.90 |
| | PR State Income Tax | -13.14 | 99.64 |
| | PR SUI/SDI Tax | -0.84 | 5.57 |
| Net Pay | | $244.60 | |

Your federal taxable wages this period are $280.00

---

LA MEXICANA, INC.

016435

| EMPLOYEE# | EMPLOYEE NAME | | | | | SSN |
|---|---|---|---|---|---|---|
| FERFAU | PAULINO FERMIN | | 9/27/99 | | | 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 |

| PAY | | | | TAXES WITHHELD | DEDUCTIONS | YEAR TO DATE |
|---|---|---|---|---|---|---|
| TYPE | RATE | HOURS | EARNINGS | | | |
| HOUR | $8.00 | 12.25 | $98.00 | F.I.C.A. $1.42 | | EARNINGS $588.00 |
| | | | | $6.08 | | F.I.C.A. W/H $38.53 |
| | | | | MED | | MED W/H $36.46 |
| | | | | | | FED. W/H $4.56 |
| | | | | FEDERAL | | LOCAL W/H |
| | | | | EIC $0.53 | | $3.18 |
| PAY PERIOD | 9/19/99 | TOTAL 25 | TOTAL 00 | TOTAL 03 | TOTAL | NET PAY |

# EXHIBIT B


